JAMES L. DENNIS, Circuit Judge,
dissenting:
The majority concludes that appellant-defendant Mace McGrew received constitutionally sufficient assistance of counsel when his criminal defense attorney declined to seek to suppress an inculpatory statement procured in violation of the Fifth Amendment. McGrew’s trial counsel, Edward Bravenec, failed to investigate the factual or legal basis for suppression, and instead blindly relied upon an illogical assumption that a police officer testifying for the prosecution’s case-in-chief would testify in accordance with the theory of defense. The police officer’s testimony regarding McGrew’s unconstitutionally elicited statement established an essential element of the offense of conviction, being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). After a jury trial, McGrew was convicted and sentenced to fifty-one months of imprisonment.
The majority credits Bravenec’s assertion that the decision to decline to seek suppression of McGrew’s statement was strategic and thus does not amount to ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because I disagree with the majority’s contention that a defendant’s Sixth Amendment right is adequately protected when counsel fails to move to suppress incriminating testimony against his client without prior legal and factual investigation into the likelihood of success of the motion and its potential benefits to his client’s defense, I respectfully dissent.
I.
The crux of McGrew’s argument on appeal is that his self-incriminating statement to the police during a custodial interrogation should have been suppressed because the officers did not read him his Miranda warnings. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As noted by the majority, because he did not raise this issue on direct appeal, he is procedurally barred from bringing it in this collateral habeas petition unless he shows cause for the procedural default and actual prejudice resulting from the error. United States v. Frady, 456 U.S. 152, 167-68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); United States v. Pierce, 959 F.2d 1297, 1301 (5th Cir.1992). A petitioner may satisfy the cause-and-actual-prejudiee standard by showing that trial counsel rendered unconstitutionally ineffective assistance of counsel. Pierce, 959 F.2d at 1301; see also United States v. Patten, 40 F.3d 774, 776 (5th Cir.1994). In other words, in order to overcome the procedural default, McGrew must demonstrate cause and prejudice by showing that his trial counsel was ineffective. In my view, McGrew has *349 sufficiently established that trial counsel’s performance violated his Sixth Amendment right to effective assistance of counsel, has overcome the procedural default, and is thus entitled to relief.
II.
McGrew was at the home of his girlfriend, Renee Chapman, who was on probation at the time, when two probation officers and two sheriffs, including Officer Gallegos, went to the home to check on Chapman. Chapman’s probation officer initiated the check after being falsely notified that narcotics were being manufactured in and sold from the premises. Chapman consented to the search of the home. Neither McGrew nor Chapman were allowed to leave the house once the search began. McGrew remained in the living room, surrounded by multiple officers, throughout the entirety of the approximately two-and-a-half hour occurrence.
During the search of Chapman’s home, the probation officers found an AK-47 assault rifle in a blue sleeve, a safe, and a bullet-proof vest, under the bed in the master bedroom that McGrew and Chapman shared. Officers also found ammunition, an empty pistol holder, and some marijuana. When the officers brought these items into the living room, McGrew voluntarily admitted that the marijuana was his but initially stated that the rifle was not. As for the safe, McGrew and Chapman told the officers that it belonged to their friend, William Tutt. Tutt was called and thereafter came over to Chapman’s house with the key and opened the safe for the officers. Inside the safe was cash, a rifle magazine, ammunition, and some plastic bags.
Without reading McGrew his Miranda rights, and while McGrew was not free to leave the premises, Gallegos questioned McGrew for the purpose of procuring an incriminating statement regarding the firearm — that is, a confession from McGrew that he knowingly possessed the firearm.[1] This custodial interrogation lasted approximately one hour. Later, during McGrew’s trial for being a felon in possession of a firearm, Gallegos testified that during the interrogation, McGrew denied ownership of the gun, denied knowledge of the contents of the safe, but admitted to Gallegos that he knew the firearm was under his bed. The prosecution’s theory of the case was that McGrew constructively possessed the firearm because he knew it was stored under his bed. Gallegos’s testimony thus established an essential element of being a felon in possession of a firearm.
Bravenec, McGrew’s defense attorney, did not move to suppress McGrew’s statement to the police regarding the firearm under his bed, despite Bravenec’s possession of Gallegos’s police report indicating *350 that McGrew made incriminating statements to the officers with regard to the firearm. Bravenec knew or should have known that McGrew had been interrogated without having been given his Miranda rights warnings and he does not contend otherwise. Nonetheless, Bravenec made no attempt at any stage of the proceedings to exclude the statement — he failed to file a pretrial motion to suppress and likewise did not move to strike Gallegos’s testimony regarding the statement after it was elicited on direct examination.
III.
The Supreme Court in Strickland announced a high, but not insurmountable, standard for establishing an ineffective-assistance-of-counsel claim. There is a two-step process for assessing such a claim:
First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
466 U.S. at 687, 104 S.Ct. 2052. To establish deficiency, the defendant “must show that counsel’s representation fell below an objective standard of reasonableness.” Id. at 688, 104 S.Ct. 2052. “[A] court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.” Id. (internal quotation marks omitted). “[Cjounsel’s failure to move to suppress evidence, when the evidence would have been suppressed if objected to, can constitute deficient performance.” Ward v. Dretke, 420 F.3d 479, 488 (5th Cir.2005) (internal quotation marks omitted). In assessing whether counsel’s performance with respect to his decision not to file a motion to suppress was objectively reasonable, the court must first determine if the decision “could be construed as ‘sound trial strategy,’ ” and, if it concludes “that the decision was strategic, conscious, and informed, then [the court] should ask whether it rendered the proceedings obviously unfair.” United States v. Cavitt, 550 F.3d 430, 440 (5th Cir.2008). If the court concludes that the decision was not a “sound trial strategy,” but rather falls below an objectively reasonable standard of representation, then the court moves to the second prong of the Strickland analysis to determine whether the defendant was prejudiced by counsel’s deficient performance. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052; Day v. Quarterman, 566 F.3d 527, 536 (5th Cir.2009).
A.
Without investigation or research, Bra-venec’s decision to abstain from attempting to suppress McGrev/s custodial statement — a statement that established an essential element of the charge and was made in violation of Miranda — was not “sound” trial strategy or within the objective standard of reasonableness and thus amounts to deficient representation under Strickland. See, e.g., Kimmelman v. Morrison, 477 U.S. 365, 387, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (concluding that counsel’s decision to decline to seek suppression after failing to request discovery — and thus without any knowledge of the State’s case — constituted deficient performance).
*351 Despite his protestations to the contrary, Bravenec’s failure to seek suppression of McGrew’s inculpatory statement was not a tactical, sound trial decision. During the evidentiary hearing regarding McGrew’s ineffective-assistanee-of-counsel claim, Bravenec insisted that his decision was part of his trial strategy, asserting that he believed that Officer Gallegos’s testimony would be that McGrew was unaware that a riñe was under his bed, yet knew that Tutt had placed some unknown property there. Bravenec’s defense theory was that McGrew lacked knowledge of what exactly Tutt stored under the bed, had no actual knowledge of the rifle, and therefore did not have constructive possession of the weapon. Bravenec’s only basis for believing that Gallegos would testify in accord with this theory was Gallegos’s report — which was essentially a single paragraph with just two sentences dedicated to an hour-long custodial interrogation. Bra-venec had no other written record or transcript of what was said during that hour, nor any indication of how Gallegos may have interpreted McGrew’s statements. Thus, Bravanec had no reliable indication of what transpired during the interrogation and no reasonable or informed basis to conclude that suppression was not warranted. Moreover, Bravanec’s trial file revealed that he did not interview any of the officers involved, nor did his file contain any evidence of research into Fifth Amendment law, and further, it lacked any indication that he discussed the issue of suppression with McGrew. The record therefore suggests that, rather than conduct an investigation, Bravenec guessed that Gallegos would testify for the prosecution in a way that did not help the prosecution, but helped the defense.
1.
To reach the assumption that Bravenec reached — that Gallegos’s testimony regarding McGrew’s statement would be favorable — one has to choose between the least likely of two possible interpretations of Officer Gallegos’s report. Gallegos’s report states, in pertinent part:
[I] took all the evidence into the living room and as [McGrew] saw what I had he stated that the marijuana was his. As for the weapon, he stated that a male he slightly knew [Tutt] had brought over a small safe and the weapon inside a blue sleeve. He stated that he had given permission to [Tutt] to place the property under the bed. [McGrew] stated that he had not asked [Tutt] what he had but gave him permission to bring it over and leave it at the residence.
During the evidentiary hearing, Bravenec admitted that there are two possible readings of this passage. One, that McGrew admitted he gave Tutt permission to keep the safe and weapon under his bed and thus inevitably knew and consented to storing the firearm in the house. In this interpretation, the words “the property,” refer back to the “safe and the weapon inside the blue sleeve” — i.e., “He stated that he had given permission to [Tutt] to place the [safe and the weapon inside a blue sleeve] under the bed.” Under this interpretation, McGrew’s statement is highly inculpatory in that it establishes his knowledge and constructive possession of the weapon. And, of course, this inculpa-tory interpretation was the one presented at trial. A second interpretation is that McGrew gave Tutt permission to store unspecified items under the bed and never knew what Tutt placed there until officers confronted him about it during the search. Under this interpretation, one must assume that “the property” ¿oes not refer to the safe and the weapon, but instead indicates only that McGrew knew that something would be placed under the bed and thus McGrew did not have actual knowl *352 edge of the weapon — in other words, “He stated that he had given permission to [Tutt] to place [some unknown objects] under the bed.”
Bravenec was unable to explain why he relied on the second, exculpatory interpretation. Bravenec’s file and testimony reflect that he never spoke with or attempted to interview Gallegos to determine the substance of Gallegos’s intended testimony regarding McGrew’s custodial statements. Moreover, Gallegos was a Sheriffs Deputy testifying for the prosecution. The prosecution’s theory of the case was that McGrew constructively possessed the firearm because he knew that it was stored under his bed. Thus, it is objectively unreasonable to conclude that Gallegos would testify for the prosecution’s case-in-chief that, in fact, McGrew did not know the firearm was under his bed, particularly given the other, more likely interpretation of the report. Bravenec unreasonably used .this scant, vague police report as the primary basis with which he decided to squander the opportunity to preclude McGrew’s inculpatory statements that were obtained in violation of his Fifth Amendment right against self-incrimination and which could have been suppressed had Bravenec attempted to do so.[2]
2.
The majority asserts that, in addition to Gallegos’s report, Bravenec also properly relied upon other police reports to make the purportedly strategic decision to decline to move to suppress the incriminating statement. During the evidentiary hearing, Bravenec pointed to Probation Officer Brady’s report, suggesting that this report indicated that McGrew denied knowledge of the firearm, consistent with the theory of defense. However, it is doubtful that Brady was even present for the relevant interrogation. At trial, Brady testified that he was not the best person to ask regarding what McGrew and Tutt told the police officers. Rather, Brady’s focus was on Chapman, the subject of his probation compliance check. Brady testified that he went to the back of the house to speak with Chapman while McGrew remained in the living room with the police officers. Thus, Brady’s report may have only reflected McGrew’s initial, voluntary statement, in which he admitted the marijuana was his but denied ownership of the rifle, without any indication as to further statements McGrew made during the hour-long interrogation with the other officers. Bra-venec had no sound or informed basis for assuming that Brady’s report provided any insight into Gallegos’s testimony regarding the hour-long custodial interrogation for which Brady was not present.
Bravenec also testified that his assumptions regarding the meaning of Gallegos’s report comported with McGrew’s own assertions that he did not know the rifle was under the bed and that he never told the police he had knowledge of the gun. However, the facts McGrew provided to his attorney as he best recalled them, without further investigation, do not provide a sufficient foundation upon which counsel *353 could reasonably discern what Gallegos’s report meant; what McGrew might have said while in the custodial interrogation; how Gallegos might have interpreted McGrew’s custodial statements; or the nature of Gallegos’s impending testimony. I fail to see how without any investigation and based upon a faulty assumption that a police officer would testify for the prosecution in accordance with his client’s asserted version of events, Bravenec’s failure to move to suppress McGrew’s inculpatory statement is in any way a reasonable or “tactical” trial strategy.
3.
Support for the conclusion that Brava-nec’s performance fell below the objective standard of reasonable representation is found in the American Bar Association’s (“ABA”) Standards for Criminal Justice. See Richards v. Quarterman, 566 F.3d 553, 564 (5th Cir.2009) (“In evaluating counsel’s performance, the Supreme Court has long referred to the [ABA] Standards for Criminal Justice as ‘guides to determining what is reasonable.’ ” (citing Rompilla v. Beard, 545 U.S. 374, 387, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005))); see also Wiggins v. Smith, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); Strickland, 466 U.S. at 688, 104 S.Ct. 2052. The relevant ABA Standards note:
[A] well-founded basis for suppression of evidence may lead to a disposition favorable to the client. The basis for evaluation of th[is] possibility] will be determined by the lawyer’s factual investigation for which the accused’s own conclusions are not a substitute .... [A]n essential function of the advocate is to make a detached professional appraisal independent of the client’s belief that he or she is or is not guilty.
ABA STANDARDS FOR CRIMINAL JüSTICE, DUTY to Investigate § 4-4.1 (3d ed.1993). Bra-venec’s reliance on an ambiguous police report, which he interpreted in light of his client’s assertions that he was not guilty and had not made any statements indicating guilt to the police, fall far below the duty owed to his client, as outlined in the ABA Standards above.
Moreover, a pretrial suppression hearing is the defense counsel’s first opportunity to use the adversarial system to test what is often the prosecution’s most damaging evidence of guilt. Even where counsel is uncertain of the likelihood of success of his suppression motion, a suppression hearing provides the defense attorney with an opportunity to preview the relevant witnesses’ testimony, which allows for better trial preparation and competent, zealous advocacy. If counsel successfully suppresses the evidence, particularly, like here, when the evidence establishes an essential element of the crime, suppression can vastly change the outcome for the defendant. For example, after suppression, the prosecution may decline to prosecute, may offer a favorable plea deal, or even if a trial will follow, the prosecution may have a weaker case against the defendant. To abandon the opportunity to suppress the evidence or hold a suppression hearing thus has substantial and often outcome-determinative consequences for the client. To provide reasonably adequate representation then, defense counsel must conduct an investigation into the relevant facts and legal basis for suppression before declining to move to suppress. See National Legal Aid & Defender Association [“NLA-DA”], PERFORMANCE GUIDELINES FOR CRIMINAL Defense Representation, Guideline 5.1 The Decision to File Pretrial Motions, available at http://ivww.nlada.org' De fender/Defender_Standards/Perform-ance_Guidelines (last visited Nov. 13, 2013) (“The decision to file pretrial motions should be made after thorough in *354 vestigation, and after considering the applicable law in light of the circumstances of each case.”) (emphasis added); see also House v. Balkcom, 725 F.2d 608, 618 (11th Cir.1984) (“Pretrial investigation ... is, perhaps, the most critical stage of lawyer’s preparation.”). As the Supreme Court explained, “counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.” Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052. Thus, defense counsel’s significant opportunity to obtain a favorable outcome for his client in the pretrial motion to suppress compels recognition that, in this context, “[a] reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful.” United States v. Williamson, 183 F.3d 458, 462 (5th Cir.1999) (emphasis added). As the Sixth Circuit has persuasively noted, “[c]onstitutionally effective counsel must develop trial strategy in the true sense — not what bears a false label of ‘strategy1 — based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation.” Ramonez v. Berghuis, 490 F.3d 482, 489 (6th Cir.2007) (emphasis added). In light of the ABA and NLA-DA Standards, as well as Supreme Court and circuit case law emphasizing the importance of an attorney’s duty to investigate, Bravenec’s decision to decline to suppress an unconstitutionally obtained statement on an assumption that a police officer called by the prosecution would testify in the defense’s favor cannot reasonably be interpreted as a “strategic, conscious, [or] informed” decision. Cav-itt, 550 F.3d at 440.
4.
Despite the lack of investigation or research, the majority contends that Brave-nec’s decision was strategic and that any resulting harm caused by his merely “risky” strategy, see Maj. Op. ante at 347, was mitigated by Bravenec’s cross-examination of Officer Gallegos and thus was not “so ill chosen that it permeate[d] the entire trial with obvious unfairness.” Dretke, 404 F.3d at 885 (quoting Jones, 287 F.3d at 331). The majority reasons that on cross-examination, Bravenec elicited testimony from Gallegos that “the officers had not questioned McGrew about the rifle before showing it to him and conceded that ‘[o]nly after he had seen the gun did he say, oh, that must be Mr. Tutt’s.’” See Maj. Op. ante at 347. In isolation, this statement arguably supports the theory of defense; however, the majority fails to explain that Gallegos never backtracked from his initial testimony on direct examination that McGrew admitted that he knew the gun was there. A close review of the cross-examination in its entirety reveals that the cross-examination cannot fairly be read as a cure to Bravenec’s failure to suppress the statement and in fact allowed Gallegos to further highlight and reaffirm McGrevifs inculpatory, unconstitutionally procured statement. To demonstrate, the following testimony from Bravenec’s cross-examination of Gallegos cannot reasonably be interpreted as favorable to the defense:
Q: [McGrew] also told you that he didn’t know what Mr. Tutt had brought over.
A: In the safe. He acknowledged him knowing bringing over the weapon and that the weapon was under the bed. He just said he didn’t know what was in the safe.
Q: ... [Y]ou don’t know what Mr. McGrew did or did not see and what he did or did not see when it was brought *355 over, if it was brought over on the 29th? Right?
A: That is correct.
Q: So, what you are just going on is based on your examination of the scene and based on your common experiences as a police officer. Right?
A: And, what Mr. McGrew told me.
Q: Okay. And, by his own admittance . here he says, “oh, that must have been what Mr. Tutt brought over but I didn’t know what that was.” Correct?
A: Yes, sir ... Part of the answer, yes, sir.
(Emphasis added). As Gallegos implied on cross-examination, the statement that the majority points to is only part of McGrew’s statement and does not necessarily negate McGrew’s actual knowledge of the firearm. Further, on redirect, Gallegos again testified that McGrew stated that Tutt brought over a small safe and the weapon inside a blue sleeve, implying that McGrew had knowledge of what was being brought to the home and merely did not know the contents of the safe.
5.
In our adversarial system, a pretrial suppression hearing may be the best opportunity for the defense to test the prosecution’s case. Thus, before declining to seek suppression of incriminating evidence, reasonably effective counsel must conduct an investigation into the facts and legal bases for suppression, and may not reasonably rely on an assumption or guess. Otherwise, “[s]uch a complete lack of pretrial preparation puts at risk both the defendant’s right to an ample opportunity to meet the case of the prosecution, and the reliability of the adversarial testing process.” Kimmelman, 477 U.S. at 385, 106 S.Ct. 2574 (quotation marks and citations omitted). Bravenec’s abandonment of the opportunity to suppress incriminating, unconstitutionally procured evidence without investigation or research, and based instead on an illogical assumption, fell far below the objective standard of reasonableness and constitutes deficient representation under the first Strickland prong.
B.
Under Strickland’s second-prong, McGrew must establish “that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.” 466 U.S. at 687, 104 S.Ct. 2052. Specifically, McGrew “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. at 694, 104 S.Ct. 2052.
A review of the record indicates that, but for counsel’s objectively unreasonable failure to move to suppress McGrew’s incriminating, unconstitutionally elicited statement, there is a reasonable probability that there would have been a different outcome, thus undermining confidence in the conviction. The result of Bravenec’s deficiency was that Officer Gallegos was able to testify that McGrew explicitly admitted what was essentially the only element of the crime in dispute. In McGrew’s appeal of the district court’s initial denial of his motion for relief pursuant to 28 U.S.C. § 2255, a unanimous panel described McGrew’s statement as having a “devastating impact” on the case and reasoned that, “[a]lthough the government introduced other evidence at trial supporting the inference that McGrew had knowledge of the rifle, no evidence was as damaging as McGrew’s admission.” United States v. McGrew, 397 Fed.Appx. 87, 94 (5th Cir. *356 2010) (unpublished) (remanding the case for the evidentiary hearing regarding McGrew’s Fifth Amendment and ineffective-assistance-of-trial-counsel claim). That panel noted that “McGrew’s admission was certainly probative evidence of his guilt,” and recognized the inherently damaging nature of a defendant’s admission, citing United States v. Avants, 278 F.3d 510, 522 (5th Cir.2002) (the defendant’s confession is “powerful evidence of guilt, the admission or exclusion of which would be highly likely to affect the outcome of the trial”), and Pyles v. Johnson, 136 F.3d 986, 996 (5th Cir.1998) (a confession is “probably the most probative and damaging evidence” against the defendant). Significantly, the panel stated that, “[a]ssuming that .a motion to suppress would have been successful,” which after an evidentiary hearing, we now know it would have been, “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” McGrew, 397 Fed.Appx. at 94 (quoting United States v. Rosalez-Orozco, 8 F.3d 198, 199 (5th Cir.1993)). As a panel of this court has already indicated, McGrew’s trial was prejudiced by counsel’s deficient failure to move to suppress his unconstitutionally obtained, incriminating, inadmissible statement, and consequently McGrew was “deprive[d] ... of a fair trial, a trial whose result is reliable.” Strickland, 466 U.S. at 687, 104 S.Ct. 2052.
IV.
Because McGrew has established both the deficiency and prejudice prongs of the Strickland standard, he has overcome the procedural default. Accordingly, I respectfully dissent.

. An officer is required to administer Miranda warnings when a person is in custody and subject to interrogation. Whether a person is in custody is determined by an objective analysis of whether, under the circumstances, a reasonable person would have felt he or she was at liberty to terminate the interrogation and leave. Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). "Volunteered statements of any kind are not barred by the Fifth Amendment.... [T]he special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation.” Rhode Island v. Innis, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Because McGrew was surrounded by multiple officers, was not permitted to leave, and was asked questions by Officer Gallegos for the purpose of eliciting incriminating statements regarding the firearm, he was subject to a custodial interrogation and should have been provided Miranda warnings before Gallegos began questioning him.

. The record does not clearly establish whether Bravenec had actual knowledge that the statements were taken in violation of McGrew’s Fifth Amendment rights. However, if Bravenec had interviewed the officers involved, or even discussed with McGrew what occurred immediately prior to the interrogation, he would have discovered that (as established by the trial and evidentiary hearing) McGrew was in custody and was asked questions by Gallegos for the purpose of eliciting incriminating statements without first being provided Miranda warnings. Thus, with minimal investigation — interviewing his client and the officers involved — Bravenec could have determined that the statements were subject to exclusion. See Miranda, 384 U.S. at 471-77, 86 S.Ct. 1602.